Opinion filed June 7, 2012

In The

# Eleventh Court of Appeals

_____

## No. 11-10-00124-CV
_____

## MARK HARRINGTON, Appellant

## V.

## DAWSON-CONWAY RANCH, LTD., Appellee

### On Appeal from the 259th District Court

### Shackelford County, Texas

### Trial Court Cause No. 2008-089

## O P I N I O N

Our former opinion and judgment dated May 31, 2012, are withdrawn, and our opinion and judgment dated June 7, 2012, are substituted therefor.

The issue in this case is whether the owners of the Dawson-Conway Ranch, Ltd. have an easement, either by implication or by prescription, to use a road on the Harrington Ranch that borders the Dawson-Conway on the west. A short portion of the road is south of the Dawson-Conway and crosses the Harrington Ranch from County Road 201 to an access point at the southwest corner of the Dawson-Conway. We shall refer to this portion as the first access road. From the first access point, the road runs northward across the Harrington Ranch to a second access point on the Dawson-Conway. At the second access point, that part of the Dawson-Conway is the north border of the Harrington Ranch. This longer portion of the road across the Harrington Ranch shall be referred to as the second access road.

The two ranches were originally part of the Monroe Ranch. In 1901, the Monroe Ranch first conveyed part of its ranch to Dawson-Conway's predecessors in interest and then conveyed another part of its ranch (to the immediate west of Dawson-Conway's property) to Mark Harrington's predecessors in interest. The only evidence concerning the establishment of the road was that the road was in existence sometime in the 1940s. To reach the second access point, the road crosses sections 199, 198, and 197 of Harrington's property.

In December 2007, Harrington closed the road between the first access point and the second access point, but he continued to allow access to the Dawson-Conway Ranch at the first access point. He claimed the closing was because of the trash left on his ranch by people going to the Dawson-Conway and not respecting his property. Dawson-Conway filed suit against Harrington in June 2010, claiming an implied easement by necessity at the time of severance. Dawson-Conway also pled an easement by prescription, citing the ten-year adverse possession statute. TEX. CIV. PRAC. & REM. CODE ANN. § 16.026 (West 2002). As an alternative pleading, Dawson-Conway claimed a prescriptive easement to the entrance at the first access point.

Both parties filed motions for summary judgment. There was no evidence that the road, or even an easement, existed over Harrington's ranch at the time of severance. Dawson-Conway based its motion on the claim for a prescriptive easement. Harrington filed a standard motion for summary judgment and a no-evidence motion for summary judgment against both easement claims of Dawson-Conway. The trial court granted Dawson-Conway's motion and denied Harrington's motions. We reverse and render judgment that Harrington's motions should have been granted and that Dawson-Conway's motion should have been denied. Dawson-Conway did not establish a right to an easement over the Harrington Ranch.

*Harrington's Issues on Appeal*

In Harrington's first issue, he argues that the trial court erred in admitting as evidence the affidavit of A.V. Jones Jr. who stated that "[i]t has always been [his] understanding that this access route as it crosses sections 199, 198, and 197 [of Harrington's property] was permitted by the owners of Dawson-Conway." In Harrington's second issue, he contends that the trial court erred in denying his motions for summary judgment. In the alternative, Harrington contends in his third issue that the trial court erred in granting Dawson-Conway's motion for summary judgment because there was a genuine issue of material fact as to at least one element of each of

Dawson-Conway's claims. In his fourth and final issue, Harrington contends that the trial court's judgment was overbroad. We need only reach the first two issues.

*Background Facts*

Dawson-Conway consists of approximately forty-two sections of land (over 26,000 acres) in Shackelford County. One access to the ranch is County Road 167. County Road 167 ends at the Dawson-Conway at its northwest quadrant. To reach the rest of the ranch, however, one must cross the Clear Fork of the Brazos River. Thomas S. Dill, representative for the Dawson-Conway, stated in his affidavit that the river crossing is frequently impassable and not dependable. But, in his deposition, Dill acknowledged that he has crossed the river in a four-wheel drive pickup, stating that the water is generally one or two feet deep. Once across the river, he has access to the entire Dawson-Conway. The Clear Fork of the Brazos River also splits the Harrington Ranch, and Harrington testified that he crosses the river without a bridge.

In Dill's affidavit, he described the southwest quadrant of the Dawson-Conway as being extremely rough. Yet it is obvious from the map that oil and gas lessees accessed much of the ranch, including the southern part, to drill wells. Sections 193 and 194, near the Limited Access Point, have the name of Jones who conducted drilling operations on both ranches. In addition, Harrington testified that there were roads in the southwest quadrant of the Dawson-Conway that could be used by vehicles; he saw the roads when he rode horseback helping Bud Wilfong work cattle. Harrington and Wilfong at one time went near the center of the Dawson-Conway, loaded the cattle, and then exited using the first access point. Harrington expressed his opinion that it would not be difficult to build better roads on the Dawson-Conway if the owners or lessees did not like the roads that were there.

There was no evidence when the disputed road over Harrington's property was first established or used. The first access road from County Road 201 may have been used from the time of severance, but there was no evidence of such use or when County Road 201 was built. Nor was there any evidence of when someone built the second access road that crosses sections 197, 198, and 199 of Harrington's property. Jones remembered using the road in the 1940s to go quail hunting on the Dawson-Conway.

Harrington's predecessors began leasing land for mineral production as early as 1918. Those leases gave producers the right to use or establish roads on Harrington's land. Dawson-Conway acknowledged that Harrington, his predecessors, his grass lessees, and his hunters used

the road along with their use of the road. Dawson-Conway's hunters, grass lessees, mineral lessees, and personnel have used the road from County Road 201 to the second access point for many years. Harrington maintained that he and his predecessors permitted the use of the road by Dawson-Conway, stating that he wanted to be a good neighbor.

In December 2007, Harrington had had enough of Dawson-Conway's hunters throwing trash on his land, mistakenly assuming they were on the Dawson-Conway and shooting deer on Harrington's land, driving too fast on the road (at one point running over a calf belonging to Harrington's grass lessee), and shooting a dog belonging to one of Harrington's managers. Harrington testified that he had never been notified that Dawson-Conway claimed a legal right to use the road on his land until he locked the gates to prevent access to the second access road. Harrington continued to allow Dawson-Conway to use the first access road.

*Standard of Review*

When competing motions for summary judgment are filed and one is granted and the other denied, the reviewing court must review the summary judgment evidence presented by both sides, determine all questions presented, and render such judgment as the trial court should have rendered. *Comm'rs Court of Titus Cnty. v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997). We review the trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Dawson-Conway filed a traditional motion for summary judgment, while Harrington sought summary judgment on both traditional and no-evidence grounds.

In a traditional summary judgment motion brought under TEX. R. CIV. P. 166a(c), the moving party has the burden of showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Browning v. Prostok*, 165 S.W.3d 336 (Tex. 2005); *Knott*, 128 S.W.3d at 215–16. A no-evidence summary judgment motion made pursuant to TEX. R. CIV. P. 166a(i) is essentially a motion for a pretrial directed verdict. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581 (Tex. 2006). Once such a motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. *Tamez*, 206 S.W.3d at 582; *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). We review the summary judgment evidence in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could and disregarding contrary evidence unless reasonable jurors

4

could not. *Tamez*, 206 S.W.3d at 582; *see Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). An appellate court reviewing a summary judgment must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *Mayes*, 236 S.W.3d at 755; *City of Keller*, 168 S.W.3d at 827.

*Prescriptive Easement Claim*

The trial court granted Dawson-Conway's motion for summary judgment, holding that Dawson-Conway had established a prescriptive easement from County Road 201 to the second access point. Dawson-Conway's summary judgment evidence consisted of portions of Harrington's deposition, an affidavit by Jones, an affidavit by Dill, and maps. Harrington contends that Dawson-Conway did not meet the requirements for a prescriptive easement. We agree. The trial court should have denied Dawson-Conway's motion and granted Harrington's no-evidence motion and his standard motion for summary judgment.

A prescriptive easement is not well-regarded in the law. *McClung v. Ayers*, 352 S.W.3d 723, 728 (Tex. App.—Texarkana 2011, no pet.); *Tiller v. Lake Alexander Properties, Ltd.*, 96 S.W.3d 617, 624 (Tex. App.—Texarkana 2002, no pet.); *Toal v. Smith*, 54 S.W.3d 431, 425 (Tex. App.—Waco 2001, pet. denied); *Wiegand v. Riojas*, 547 S.W.2d 287, 289 (Tex. Civ. App.—Austin 1977, no writ). To obtain a prescriptive easement, one must use someone else's land in a manner that is open, notorious, continuous, exclusive, and adverse for a period of ten years or more. *Brooks v. Jones*, 578 S.W.2d 669, 673 (Tex. 1979). Exclusivity is not met when landowner and claimant both use the road. *Vrazel v. Skrabanek*, 725 S.W.2d 709, 711 (Tex. 1987). When a landowner and a claimant of an easement both use the same road, use by the claimant is not exclusive to the landowner's use and is not adverse. *Brooks*, 578 S.W.2d at 673. Dawson-Conway admits that Harrington also used the road. Dill testified that nothing prevented Harrington from using the road. Joint use of a road, no matter for how long, cannot ripen into an easement by prescription. *Vrazel*, 725 S.W.2d at 711; *Othen v. Rosier*, 226 S.W.2d 622, 626 (Tex. 1950).

Harrington contends that Dawson-Conway's use of the road has been with his permission and that mere joint use, without more, will not establish a prescriptive easement. *Tiller*, 96 S.W.3d at 624. Dawson-Conway concurs that this is a correct assertion of the law where there is joint use. But Dawson-Conway relies on *Scott v. Cannon*, 959 S.W.2d 712, 722 (Tex. App.—

Austin 1998, pet. denied), for an exception to the general rule: *independent acts* coupled with joint use by the claimant may be sufficient to establish the requisite adversity. The emphasis on "independent acts" by the *Scott* court is key to that court's analysis. *See Allen v. Allen*, 280 S.W.3d 366, 379 (Tex. App.—Amarillo 2008, pet. denied) (distinguishing *Scott* on the facts and holding that the evidence was legally insufficient to sustain jury's finding of prescriptive easement).

This court cited *Scott* in *Strain v. Knipe*, No. 11-98-00207-CV, 1999 WL 33748004 (Tex. App.—Eastland Dec. 23, 1999, pet. denied) (not designated for publication), where we pointed out that Knipe presented evidence of such acts: Knipe had used and maintained the roadway across Strain's land and had exclusively done so since 1968; Knipe had paid for and put in two cattle guards on the roadway; and Knipe used the road exclusively except for the time that the Strains had leased Knipe's property and had used the road only to access Knipe's property to graze their cattle. In this case, there was no evidence that Dawson-Conway maintained the road or had anything to do with the road other than driving on it. The only evidence was that Harrington or his oil and gas lessee worked on the road and maintained it. Harrington said that he paid L.T. White to work on the road using Harrington's gravel.

*Scott* is distinguishable on its facts from the case before this court. In 1964, the Scotts had filed in the county clerk's office an affidavit signed by two witnesses who claimed that the road over Cannon's land was a road used by the public to go to Scott's property; the filing was done by the Scotts to obtain a home improvement loan. *Id*. at 717-18. An attorney for the Cannons discovered the 1964 affidavit by accident in 1972. The Cannons, through their attorney, notified the Scotts that the road was not a public road, but the Cannons never gave notice to the Scotts that they could not use the road. The Scotts said that they refused to remove the affidavit from the court records unless the Cannons granted them an express easement. No such document was ever presented to the Scotts, and Mrs. Cannon believed it was "a good time to just keep quiet" because she thought use of the road by the Scotts would be construed as permissive. The Austin court relied on the unique facts to hold that "[i]t is *undisputed* that in 1972 the Cannons were made aware of the Scott's claim of right to use the Road" and that that was the type of "*distinct and positive assertion*" required by the Austin court in "*Wiegand* to 'transform permissive use of an easement into an adverse use.'" *Id.* at 722. There is no evidence

6

in the record of independent *acts* by Dawson-Conway that could be construed as distinct and positive assertions of a right to use the road by Dawson-Conway.

Courts have analyzed the acquisition of an easement by prescription as being analogous to the acquisition of title by adverse possession. Therefore, a claim of prescription must be supported by proof of all of the elements that are involved in the statute of limitations for adverse possession. The hostile and adverse character of the use necessary to establish an easement by prescription is the same as that which is necessary to establish title by adverse possession. *Othen,* 226 S.W.2d at 626; *Tiller*, 96 S.W.3d at 624; *Davis v. Carriker*, 536 S.W.2d 246, 250 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e.). One test to determine whether a claim is hostile as required to establish an easement by prescription is whether the adverse possessor's use, occupancy, and possession of the land is of such nature and character as to notify the true owner that the claimant is asserting a hostile claim to the land. *Tiller*, 96 S.W.3d at 624; *Mack v. Landry*, 22 S.W.3d 524, 531 (Tex. App.—Houston [14th Dist.] 2000, no pet.). The record is devoid of any evidence that Dawson-Conway gave notice to Harrington that it was asserting a hostile claim to use Harrington's land before Harrington locked the gates.

The party claiming an easement by prescription must give notice that its use of property is under a claim of right. Otherwise, the use (especially if joint) is presumed to be permissive, and a permissive use can never ripen into an easement by prescription. *Sassman v. Collins,* 115 S.W. 337, 339 (Tex. Civ. App. 1908, writ ref'd), cited with approval in *Othen*, 226 S.W.2d at 627. There must be an independent act of hostility to transform permissive use of an easement into an adverse use so as to begin the prescriptive period. *Mack*, 22 S.W.3d at 532.

Harrington's counsel asked Dill, Dawson-Conway's representative, the following questions concerning notice:

> Q. How has your use of the road or the use of the road by your predecessors in interest, the owners of the Dawson-Conway or prior owners, how has it been such that Mr. Harrington or his predecessors in interest should have known that the use of the road was under a claim of right, that is, that y'all or your predecessors in interest were claiming a right to use the road as opposed to just permission to use the road?
>
> A. Suppose, just by our use.
>
> Q. Okay. If you'll take a look back at Paragraph 12 again [in Dawson-Conway's pleading], the next sentence says, further, this use has been under a claim of easement and not merely under license or permission.

7

How has the use been under a claim of easement and not merely license or permission?

A. Just by our use, continued use over the years.

. . . .

Q. How should Mr. Harrington or his predecessors in interest have known that you or your predecessors in interest were claiming a right to continue to use the road?

A. I don't know.

As opposed to the facts in *Scott*, neither Dawson-Conway nor its predecessors made any assertion to Harrington or his predecessors of a right to use the road until after Harrington closed the second access road. There is no evidence that Dawson-Conway contributed to the building of the road or maintained the road. The only maintenance was done by W.J. Whitt, a mineral lessee of Harrington, or by Harrington. Harrington locked the gate in December 2007 to prevent access to the portion of the road between the first access point and the second access point. Harrington testified that he had never been notified that Dawson-Conway claimed a legal right to use the road on his land until after he closed that portion of the road. Dill's testimony confirms their joint use of the road with Harrington, but he provided no evidence that Dawson-Conway gave notice they were claiming a legal right to use the road.

Dawson-Conway first relies on the following testimony by Harrington to establish adverse use. It should be noted that there was no reference by Harrington to any "acts" by Dawson-Conway that provided notice to Harrington of a prescriptive claim by Dawson-Conway. Harrington's testimony was as follows:

Q. Do you remember the general time frame, whether it was in the late 60's, early 70's, 80's, whenever it might have been that you first became aware, if ever, that representatives, whether they be hunters, oil and gas folks, whoever, were accessing the Dawson-Conway via this road?

A. What year?

Q. Generally what year, what time frame?

A. I don't know because -- I couldn't say. I couldn't say because I don't know when y'all made a lease or whatever. I just know the oil field people that were on it.

8

. . . .

Q. . . . And they got to the Dawson-Conway via this particular road?

A. Yes, sir.

Q. And that was -- how far back do you recall that being?

A. Probably in '68, '69 possibly.

. . . .

Q. I just want to know very simply when it is you -- you first learned of the adverse use of this road?

A. I just told you.

HARRINGTON'S COUNSEL: Objection, form.

Q. . . . Somewhere around the late '60s? That's your best recollection?

A. I told you '68 or '69, best of my recollection.

The context of the question to Harrington is important. Dawson-Conway did not ask which acts constituted notice to Harrington of an adverse use of the road. Dawson-Conway only wanted to know when Harrington became aware of "representatives, whether they be hunters, oil and gas folks, whoever, were accessing the Dawson-Conway via this road." Harrington was only asked about joint use. As Harrington points out in his brief, the terms "adverse" and "hostile" have long had specific legal meanings with reference to a claim of taking of rights in another's land by prescription or by adverse possession. *Evans v. Templeton*, 6 S.W. 843, 844 (Tex. 1887). The claimant must show some notorious act of ownership over the property, distinctly hostile to the claim of the landowner. *Othen*, 226 S.W.2d at 626; *Rick v. Grubbs*, 214 S.W.2d 925, 927 (Tex. 1948). Dawson-Conway's counsel and Harrington were only discussing when Harrington noticed that people were using the road to access Dawson-Conway. And Harrington testified that he allowed use of the road by Dawson-Conway because he "tried to be a good neighbor."

Given the initial question and the context, Harrington was not admitting that Dawson-Conway's joint use of the road amounted to acts that were legally adverse and gave notice to him

9

of a claim of right. Without evidence of acts by Dawson-Conway that were independent of the joint use of the road and that gave Harrington notice of Dawson-Conway's claim of a right to use the road, the quoted testimony by Harrington was legally insufficient to meet the requirements for a prescriptive easement.

Dawson-Conway relies on the following acts to show their distinct and positive assertion of a hostile claim of title: (1) Harrington did no maintenance on the road; (2) Whitt widened the road without Harrington's permission; and (3) Harrington was concerned that Dawson-Conway's hunters were not closing gates, were shooting game on Harrington's land thinking they were on the Dawson-Conway, and were driving too fast on the road.

Harrington correctly contends that the issue is not whether Harrington maintained the road. The issue is whether Dawson-Conway maintained the road in a manner that gave notice to Harrington that Dawson-Conway claimed a legal right to use the road. Dawson-Conway presented no evidence that it did any maintenance on the road. Dawson-Conway quotes at length Harrington's answers concerning Whitt's widening of the road in the 1980s, in which Harrington stated that the widening of the road was done without his permission and also that Whitt had placed tank batteries in a place on Harrington's land where Harrington did not think they were needed. The tank batteries were used for production from the Harrington Ranch. Dawson-Conway asserts that Whitt's acts were "clear evidence of independent acts of ownership." We disagree.

Whitt was Harrington's mineral lessee, and under his lease, Whitt had a right to widen the road and place tank batteries on Harrington's land. Harrington's permission was not required. Harrington's testimony quoted by Dawson-Conway provides no evidence of acts by Dawson-Conway, as required by *Scott*, that could be construed as distinct and positive assertions (separate from joint use) of a distinct and positive legal right to use the Harrington road. Whitt's acts as Harrington's lessee were not evidence of independent acts of ownership by Dawson-Conway.

The remaining testimony that is cited by Dawson-Conway as an acknowledgment by Harrington of adverse use involved a question to him about hunters who used the road to hunt on the Dawson-Conway Ranch. Harrington testified that he first learned that, in addition to oil and gas operators, some hunters used the road when Wilfong subleased the Dawson-Conway to the American Sportsmen. Wilfong was leasing the Dawson-Conway at the time. Harrington said

10

that the hunters would not close the gates and, at times, they would hunt on his property when they thought they were on the Dawson-Conway. Often, Wilfong would meet the hunters at the first access gate. Wilfong and Harrington got along well. They even mutually agreed to lock the second access gate between 1978 and 1984 because Wilfong believed he was losing steers to theft. Harrington would help Wilfong work cattle, just as he helped Stasney Ranch when they leased the Dawson-Conway. Wilfong reprimanded the hunters when they did not close the gates, hunted before they reached the Dawson-Conway, or drove too fast on the road.

The following portion of Harrington's testimony, relied on by Dawson-Conway, related to Harrington's locking the gate in December 2007 after becoming tired of the hunters' actions in using the road:

> Q. I may have asked you this in a different way and if I did I'm sorry. But getting to this -- the locking of this second gate, was there anything that precipitated that? Any event that occurred out there that made you say we need to put a lock on this gate?
>
> A. It probably would be, you know, 20 years of being out there. Enough is enough, if you understand what I'm talking about.
>
> Q. Twenty years of people using that road -- using that road?
>
> A. Yes, sir.
>
> Q. As if it was theirs?
>
> A. Yes, sir.

Dawson-Conway asserts that the statement by Harrington that he had had enough of the hunters using the road "as if it was theirs" amounts to an acknowledgment of use of the road without his permission. We disagree. Harrington did not object to joint use of the road; his objection was simply that the hunters on the Dawson-Conway were not respectful as they used his road. In his affidavit, Harrington stated that, after Wilfong lost his lease, the hunters on the Dawson-Conway had shown less and less regard for his land. Just as Dawson-Conway had various lessees of the ranch for cattle over the years, there probably also were different hunters with leases on the Dawson-Conway. Many people do not take care of their own property. Harrington apparently was referring to those types of people when he said they used the road "as if it was theirs." Harrington's answer was not "a plain acknowledgment of use without his permission." A more reasonable construction is that he tried to be a good neighbor allowing

11

joint use of his road, but the negligent and inconsiderate actions by Dawson-Conway's hunters finally exhausted his patience. The quoted "as if it was theirs" amounted to no evidence or certainly not more than a scintilla of evidence.

Actions by Dawson-Conway's hunters did not show any intent to possess the road adversely to Harrington. Their use was consistent with joint use of the road. Looking to the adverse possession analogy under the ten-year limitation statute, "[n]o matter what the use and occupancy of the land may be, the possessor must intend to appropriate it." *Calfee v. Duke*, 544 S.W.2d 640, 642 (Tex. 1976).

Dawson-Conway relies on an affidavit by Jones, an oil and gas operator who leased both ranches at times, as evidence to support Dawson-Conway's motion for summary judgment. Jones stated the following:

> It has always been my understanding that this access route as it crosses sections 199, 198, and 197 was permitted by the owners of the Dawson-Conway.

Harrington objected to this evidence, but his objection was overruled. Rulings concerning the admissibility of evidence are committed to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000).

Jones stated that he had been in the oil and gas business in Shackelford County since 1953 and that his father had oil and gas operations in the county starting in 1932. Although he stated that he was familiar with the Dawson-Conway Ranch and the road on Harrington's ranch, nowhere does he state what underlying facts led to his "understanding," only that he was thoroughly familiar with the area. Simply seeing the road and the ranches would not necessarily lead to an understanding that Dawson-Conway controlled the Harrington road. The affidavit violated the "Banjo Rule."[1]

The trial court erred in admitting the Jones affidavit as evidence. It is insufficient as summary judgment evidence to support Dawson-Conway. His subjective "understanding" was a conclusion, and there is nothing in the affidavit to support that conclusion. Even if the affidavit was admissible, there is nothing in the record indicating that Jones communicated his understanding to Harrington; therefore, it was not evidence that Harrington was put on notice that Dawson-Conway was claiming a right to use the road in a hostile and adverse way to

---

[1]Fred A. Simpson and Deborah J. Selden, *The "Banjo Rule" on Testimony*, 20 THE ADVOCATE, Spring 2001, at 44.

Harrington. Dawson-Conway's inference from Jones's statement was not the only inference that can be drawn. Jones's understanding that Dawson-Conway permitted his use of the road was not inconsistent with a permissive joint use of the road. The affidavit testimony of Jones did not provide proof of any ultimate fact in issue. *See Allen*, 280 S.W.3d at 375–76 ("[a]s far as I can remember the road has been where it is now" was "no evidence that CR-216A and Cedar Hollow Road were synonymous").

*The Claim of Implied Easement of Necessity*

Easements may be created by express grant, by implication, by necessity, by estoppel, and by prescription. *Machala v. Weems*, 56 S.W.3d 748, 754-55 (Tex. App.—Texarkana 2001, no pet.). In addition to its prescriptive claim, Dawson-Conway pleaded an implied easement by necessity. In Harrington's no-evidence motion for summary judgment, he contended that there was no evidence to support the required elements of Dawson-Conway's claims to an implied easement by necessity over the Harrington Ranch. Harrington's no-evidence motion should have been granted.

Both parties have not carefully distinguished (1) implied easements by necessity, whether by reservation or by grant; (2) implied easements by reservation; and (3) implied easements by grant. For cases distinguishing easements by necessity from the other two implied easements, see *Miller v. Elliott*, 94 S.W.3d 38, 43 (Tex. App.—Tyler 2002, pet. denied); *Fender v. Schaded*, 420 S.W.2d 468 (Tex. Civ. App.—Tyler 1967, writ ref'd n.r.e.); *Teich v. Haby*, 408 S.W.2d 562 (Tex. Civ. App.—San Antonio 1966, writ ref'd n.r.e.); *Barrick v. Gillete*, 187 S.W.2d 683 (Tex. Civ. App.—Eastland 1945, writ ref'd w.o.m.) (court expressly noted that the case did not involve a claim of easement by necessity); *Heard v. Roos*, 885 S.W.2d 592 (Tex. App.—Corpus Christi 1994, no writ); and *McClung*, 352 S.W.3d 723.

The three separate types of implied easements have different elements. Dawson-Conway pleaded only an implied easement by necessity by grant, not an implied easement appurtenant by grant. The requirements are the same whether the claimed easement by necessity is by grant or reservation. *Bains v. Parker*, 182 S.W.2d 397, 399 (Tex. 1944). A landowner may claim an implied easement of necessity by proving that (1) unity of ownership of the dominant and servient estates existed prior to severance, (2) access must be a necessity and not a mere convenience, and (3) the necessity existed at the time the estates were severed. *Koonce v. J.E. Brite Estate*, 663 S.W.2d 451, 452 (Tex. 1984); *Crone v. Brumley*, 219 S.W.3d 65, 68 (Tex.

13

App.—San Antonio 2006, pet. denied); *Tiller*, 96 S.W.3d at 622; *Machala*, 56 S.W.3d at 755. Easements by necessity are temporary because their existence is dependent on the necessity that created them. *See Bains*, 182 S.W.2d at 399. Easements by necessity terminate upon the cessation of the necessity. *Id.*; *Sassman*, 115 S.W. 337; *Crone*, 219 S.W.3d at 69; *Miller*, 94 S.W.3d 38. Therefore, Dawson-Conway had to also prove that a necessity was continuing. The party claiming an implied easement has the burden of proving its entitlement to the easement. *Miller*, 94 S.W.3d at 43; *Wilson v. McGuffin*, 749 S.W.2d 606, 609 (Tex. App.—Corpus Christi 1988, writ denied).

The cases involving an implied easement by necessity apply a "strict necessity" test (no other access) regardless of whether the easement stems from a grant or a reservation. *Duff v. Matthews*, 311 S.W.2d 637 (Tex. 1958) (reservation claimed); *Othen*, 226 S.W.2d 622 (reservation claimed); *Bains*, 182 S.W.2d 397 (reservation claimed); *Sassman*, 115 S.W. 337 (grant claimed);[2] *Kruegel v. Nitschmann*, 40 S.W. 68 (Tex. Civ. App.—San Antonio 1897, writ ref'd) (grant claimed); *Crone*, 219 S.W.3d 65 (grant claimed); *Machala*, 56 S.W.3d at 755 (grant and reservation claimed). An easement by necessity first arose from a presumption that, where a grantor conveyed to a person land that was totally surrounded by other lands belonging either to the grantor or to the grantor and other persons, there was an intention to grant a right-of-way to enable the grantee to access the land purchased. The doctrine was then extended in favor of the grantor over his grantee's land where similar circumstances were involved. 4 Aloysius A. Leopold, *Texas Practice: Land Titles and Title Examination* § 18.31 (3d ed.); *see Bains*, 182 S.W.2d at 399.

An easement may be implied from what a "grantor and grantee must have intended had they both given the obvious facts of the transaction proper consideration." *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 207 (Tex. 1962); *see also Mitchell v. Castellaw*, 246 S.W.2d 163, 167 (Tex. 1952). To successfully prosecute a claim for an implied easement appurtenant, the dominant tract owner must prove that (1) unity of ownership between the dominant and servient estate existed, (2) the use of the easement was apparent at the time the dominant estate was granted, (3) use of the easement was continuous so that the parties intended its use to pass by grant with the dominant estate, and (4) the easement was reasonably necessary to the use and enjoyment of the dominant estate. *See Drye*, 364 S.W.2d at 207; *Daniel v. Fox*, 917 S.W.2d 106

---

[2]Because the writ was refused, *Sassman* has equal precedential value with the Texas Supreme Court's own opinions.

(Tex. App.—San Antonio 1996, writ denied); *Fender*, 420 S.W.2d at 472; *Hoak v. Ferguson*, 255 S.W.2d 258, 260 (Tex. Civ. App.—Fort Worth 1952, writ ref'd n.r.e.). As opposed to easements by necessity that may terminate, implied easements appurtenant are permanent if they are proved.[3]

The courts have interpreted the fourth requirement of "reasonably necessary" differently in implied reservation cases versus implied grant cases. In implied reservation cases, the requirement of strict necessity was first adopted by the supreme court in *Mitchell*. *Mitchell*, 246 S.W.2d at 168. In implied grant cases, many Texas courts have adopted a rule of reasonable rather than strict necessity, citing *Bickler v. Bickler*, 403 S.W.2d 354, 357 (Tex. 1966). *Bickler* was an implied easement appurtenant by grant case. The supreme court held that the dominant estate was entitled to an implied easement (use of a driveway) because Ralph Bickler had no other *legal* access to his lot. Use of the driveway was necessary to use of the dominant estate. *Bickler*, 403 S.W.2d at 357–59. The supreme court pointed out that its opinion was consistent with its earlier opinions in *Duff* and *Othen*. Yet the majority in *Daniel*, for example, expanded on the "necessary" requirement and cited *Bickler* for a test of "reasonably necessary." *Daniel*, 917 S.W.2d at 110.

Severance of the dominant estate was in 1901. Dawson-Conway proved the first requirement of an easement by necessity: unity of ownership of the dominant and servient estates existed prior to severance. But Dawson-Conway failed to adduce evidence that access over the Harrington ranch was a necessity and that the necessity existed at the time the estates were severed. *See Koonce*, 663 S.W.2d 451; *Crone*, 219 S.W.3d 65; *Tiller*, 96 S.W.3d 617; *Machala*, 56 S.W.3d. 748.

Dawson-Conway argues that it was not necessary to show that the road was there at the time of severance, only that the necessity existed at that time. But there was no evidence of that necessity. In the absence of evidence that there was a necessity to use a road or an easement over the Harrington Ranch at the time of severance because of no other legal access to the Dawson-Conway, an easement by necessity may not be imposed. *Tiller*, 96 S.W.3d at 623; *Machala*, 56 S.W.3d at 756; *Benedictine Sisters of the Good Shepherd v. Ellison*, 956 S.W.2d 629, 632 (Tex. App.—San Antonio 1997, pet. denied); *Heard*, 885 S.W.2d 595–96.

Dawson-Conway relies heavily on *Daniel* because of its distinction between the degree of

---

[3]Because there was no evidence that the roads on the Harrington Ranch existed at the time of severance, Dawson-Conway could not have shown that it was entitled to an implied easement appurtenant by grant.

necessity required for easements by implied grant and those by implied reservation. 917 S.W.2d 106. The court in *Daniel* relied on *Fender*, 420 S.W.2d at 472, to hold that the requirement for an easement by implied grant was reasonable necessity. Justice Duncan dissented, stating that, "[u]nder Texas law, a party may not have a way of necessity when he has another legal means of access to his property. *Bickler v. Bickler*, 403 S.W.2d 354, 357 (Tex. 1966); *Duff v. Matthews*, 158 Tex. 333, 311 S.W.2d 637, 642–43 (1958)." 917 S.W.2d at 113. Based on the reasoning in *Bickler* and *Duff*, Justice Duncan viewed the necessity requirement as being the same for implied easements of necessity by grant or by reservation. *Id.* In 2006, Justice Duncan wrote for a unanimous court in *Crone*, holding that a party seeking an easement by necessity must prove that he has no other legal access to his property. *Crone*, 219 S.W.3d at 69.

We follow the views expressed by the Texas Supreme Court in the easement by necessity cases of *Duff*, *Othen*, *Sassman*, and *Bains* and by the courts in *Crone*, *Machala*, and *Tiller*. In an easement by necessity case, whether by reservation or grant, we hold that the degree of necessity required is that of "strict necessity." Dawson-Conway had to show that their predecessor grantee at the time of severance had no other legal access to the Dawson-Conway property and that such a necessity still exists today. There was no evidence of such a necessity at the time of severance. And today, Dawson-Conway has a legal access to its property from County Road 167 at its northwest quadrant.

Dawson-Conway argues that the impassability of the terrain within Dawson-Conway supports its right to an easement of necessity. Dill stated that the river is impassable at times and that the terrain in the southwest quadrant is impassable. But rivers are often crossed by concrete low-water crossings, and roads can be built even in rough terrain. There was no evidence in the record as to what such solutions would cost. Oil and gas lessees often build roads for the landowner in connection with their own operations. The maps provided by Dawson-Conway indicate that there has been a lot of oil and gas activity on the ranch. Further, the topographical map indicated that roads along fence lines could access the entire Dawson-Conway. Dawson-Conway's evidence did not meet even the "reasonably necessary" test in *Daniel*, where the court

16

noted evidence that a bridge over the creek would cost more than the land was worth. Dawson-Conway provided no evidence of the cost of providing a low-water crossing or bulldozing roads in the southwest quadrant and the rest of the ranch.

The current impassability of roads on the Dawson-Conway did not give Dawson-Conway the right to an easement of necessity. *Duff*, 311 S.W.2d at 642; *Crone*, 219 S.W.3d at 70. As the court in *Adams v. Norsworthy Ranch, Ltd.*, 975 S.W.2d 424, 429 (Tex. App.—Austin 1998, no pet.), cited by Dawson-Conway, explained in rejecting an implied easement appurtenant by grant:

> The Adamses assert that they are unable to travel by car to the southern boundary of their property from the [express] Easement Road access on the northern portion due to the condition of the land. However, they concede that they can travel by foot and could build a road, but at great expense. "When one has access to a part of his tract of land by way of travel over his own property, this, as a matter of law, is a better and more direct route than one which burdens an adjacent landowner… It does not matter that the route across one's own land is longer, more circuitous, or in an inferior condition physically." *Sentell v. Williamson County*, 801 S.W.2d 220, 223 (Tex. App.—Austin 1990, no writ). Only when there is *no* way through his own land can a grantee claim a right over that of a grantor. *Duff v. Matthews*, 158 Tex. 333, 311 S.W.2d 637, 640 (1958).

The Adamses had one way of access using the express Easement Road but wanted an additional easement that they thought was reasonably necessary.

Although cited by Dawson-Conway, *Akers v. Stevenson*, 54 S.W.3d 880 (Tex. App.—Beaumont 2001, pet. denied), supports Harrington's position. *Akers* was an implied easement of necessity by grant case, although the court cited the requirements for an implied easement appurtenant by grant. On appeal, Akers (owner of the servient estate) contended that there was factually insufficient evidence to support the trial court's grant of an easement of necessity across Akers's land to reach the dominant estate known as Hollis Island. The *Akers* court cited *Daniel* but rejected Akers's contention on the basis that "[w]itnesses testified the forty-four acre tract (as well as the seventy-five acre tract) was, is, and can only be accessed by this one route" over Akers's land. 54 S.W.3d at 883. The court held that the evidence was sufficient that the route to both tracts owned by the dominant estate owner was and had always been through the forty-four acre tract only. *Id.*

The situation of the parties at the time of the severance in 1901 constitutes the operative facts to support a claim of a grant by implication. *Hoak*, 255 S.W.2d at 259. The difficulty for

17

Dawson-Conway appears to be the lack of evidence concerning the area in 1901. The only evidence of a road to the south of Dawson-Conway that existed at the time of severance was one depicted on a U.S. Geological Survey map dated 1893. According to Dawson-Conway, the map shows a road running to the east and west, located to the south of the Dawson-Conway Ranch. Access to the Dawson-Conway portion of the Monroe Ranch in 1901 may have been from that road at any point, but there is no evidence that access involved crossing over the Harrington Ranch at the time of severance. Apparently, there were no minutes available from the Shackelford County Commissioners Court concerning when County Roads 167 and 201 were established.

Harrington's first two issues are sustained. Therefore, it is unnecessary to address his third and fourth issues.

*This Court's Ruling*

The judgment of the trial court is reversed, and judgment is rendered for Mark Harrington that Dawson-Conway has no easement by prescription or by necessity across the Harrington Ranch.


TERRY McCALL
JUSTICE

June 7, 2012

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.