

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-11-00427-CV
_____

BERT WALLACE, APPELLANT

V.

KENT COUNTY, TEXAS, APPELLEE

On Appeal from the 39th District Court
Kent County, Texas
Trial Court No. 1681; Honorable Shane Hadaway, Presiding

August 21, 2013

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

This case involves the determination of whether a ranch road designated as "County Road 439" in Kent County is a private road or a public road. Bert Wallace, Appellant, appeals the trial court's declaratory judgment entered in favor of Kent County, Appellee, declaring the road to be a public road, based upon jury findings of "implied dedication to public use" and "prescriptive easement." We reverse the

judgment of the trial court and render judgment, in part, declaring the road in question to be a private road owned by Wallace; and, we remand the case to the trial court for further proceedings consistent with this opinion.

## BACKGROUND

Wallace owns a ranch in Kent County that borders County Road 440. From its intersection with County Road 440, the disputed road runs generally northward, approximately 4 miles, to a point where it dead-ends immediately in front of a residence owned by Mack Lauderdale. For nearly its entire length, the road is surrounded on both sides by Wallace's ranch. It does not intersect any other public roads. In places, it is a well maintained one-lane ranch road, clear of vegetation from edge to edge; and, in other places, it is a typical West Texas red dirt ranch road consisting of two tire paths separated by vegetation. At County Road 440, there is a cattle guard with a "POSTED" sign on the adjacent fence and there is a second gate located further up the road that is also marked with a "POSTED" sign. There is a final gate where the road enters the Lauderdale property.

Wallace's family ranched the surrounding land in the 1920s. Wallace himself leased the ranch in 1962 and eventually purchased it in 1972. After the ranch was purchased, Wallace allowed the Lauderdale family to use the road to reach their residence, even though the residence was accessible via a road to the north that intersected Highway 70. Lauderdale maintains a mailbox at that intersection, as did his mother before him. In the 1980s, Lauderdale's mother moved from the residence to town and, in 1990, Wallace installed the gates and cattle guards. The gate between the

Wallace and Lauderdale properties was usually locked except on weekends when Lauderdale visited the property.

On occasions Wallace prevented any access to the disputed road by building a 10 foot tall berm across the road at its intersection with County Road 440. In 2004, county road maintenance crews removed the berms. A dispute arose and Kent County subsequently compensated Wallace for his cost of erecting the berms. Wallace rebuilt the berms, but they were partially removed again to allow firefighters access to the disputed road in order to fight a grass fire that threatened the Lauderdale property.

The controversy leading to this litigation commenced in 2008 when Kent County initiated formal procedures, pursuant to Chapter 258 of the Texas Transportation Code, to include the disputed road on the official County Road Map as a public road.[1] Wallace initially sought to contest this inclusion by filing suit in district court pursuant to section 258.004(a). Kent County filed a cross-action for declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, seeking to declare the "rights of the parties [regarding the road in question] arising under Texas common law, and under Chapter 258."[2] Prior to trial, the parties stipulated that the question of attorney's fees would be submitted to the court post-verdict and pre-judgment and at the conclusion of a three day jury trial, the jury found: (1) Kent County continuously maintained the disputed road with public funds, beginning before September 1, 1981; (2) the county was entitled to a prescriptive easement prior to September 1, 1981, and

---

[1] *See* TEX. TRANSP. CODE ANN. §§ 258.001-.007 (WEST SUPP. 2012). Throughout the remainder of this opinion, Chapters of the Transportation Code will be referred to as "Chapter ___" and the Code's provisions will be referred to as "section ___" or "§ ___."

[2] *See* TEX. CIV. PRAC. & REM. CODE §§ 37.001 – 37.011 (WEST 2008).

(3) the county proved, by a preponderance of the evidence, that the road had been impliedly dedicated to public use before September 1, 1981.  Thereafter, the trial court issued its *Final Judgment* declaring that the disputed road was a public road, established by both implied dedication and prescription, and it authorized the county to file a metes and bounds description of the road, including "sufficient land, where reasonably available, for drainage ditches, repairs, and the convenience of the public" in the Deed Records of Kent County.  The judgment further ordered that Wallace "take nothing" from the suit.  This appeal followed.

In four issues, Wallace asserts:  (1) there was insufficient evidence to include the road on a county road map adopted by the Kent County commissioners' court pursuant to Chapter 258 of the Texas Transportation Code; (2) including the road on the county road map amounted to an unconstitutional taking; (3) there was insufficient evidence to charge the jury on prescriptive easement; and (4) there was insufficient evidence to charge the jury on implied dedication.  Because disposition of issues three and four would pretermit the necessity of addressing issues one and two, logic dictates that we address issues three and four first.

## APPLICABLE LAW

### I.    ACQUISITION OF PUBLIC INTEREST IN A PRIVATE ROADWAY

A county with a population of less than 50,000 can only acquire a public interest in a private road by: (1) purchase; (2) condemnation; (3) dedication; or (4) a court's final judgment of adverse possession.  §§ 281.001 & 281.002.  Prior to September 1, 1981, a private road could be dedicated to public use by express or implied dedication.  Kent

4

County is a county with a population of 50,000 or less. Therefore, because no one is claiming that Kent County acquired a public interest in the disputed road by purchase, condemnation, or express dedication, if a public interest in the disputed road was acquired at all, it had to have been acquired pursuant to the common law principle of implied dedication or adverse possession.

## II. ABOLISHMENT OF ADVERSE POSSESSION AND COMMON-LAW MEANS OF ACQUIRING A PUBLIC INTEREST IN A PRIVATE ROADWAY

Effective September 1, 1981, the Texas Legislature abolished the common-law doctrine of implied dedication of a public road in counties with a population of 50,000 or less. *See* TEX. TRANSP. CODE ANN. §§ 281.001, 281.003 (WEST 2013), formerly VERNON'S ANN. CIV. ST. art. 6812h, §§ 1, 4, and 6, enacted by Act of May 31, 1981, 67th Leg., R.S., ch. 613, 1981 Tex. Gen. Laws 2412. Also effective September 1, 1981, the Legislature similarly established that such a county could not establish adverse possession[3] of property for purposes of establishing a public interest in a road by the "(1) use of a private road by the public with the permission of the owner; or (2) maintenance with public funds of a private road in which a public interest is not recorded." *See* TEX. TRANSP. CODE ANN. §§ 281.004 (WEST 2013), formerly VERNON'S ANN. CIV. ST. art. 6812h, § 5, enacted by Act of May 31, 1981, 67th Leg., R.S., ch. 613. Because this legislation was not retroactive, *Las Vegas Pecan & Cattle Co. v. Zavala County*, 682 S.W. 2d 254, 256 (Tex. 1984), the existence of a public interest in a road established by implied dedication or prescription prior to September 1, 1981 was not

---

[3]Here, the trial court did not submit an issue on "adverse possession." Instead, it couched the issue in terms of a "prescriptive easement," the elements of which were, for purposes of this opinion, the same as the elements necessary to establish adverse possession. Throughout the remainder of this opinion we will refer to the county's claim as a claim for a "prescriptive easement" or a claim for the establishment of a public interest by "prescription."

5

affected. *See McCulloch v. Brewster County,* 391 S.W.3d 612, 616 (Tex.App.--El Paso 2012, no pet.); *Hayes v. Anderson County,* 315 S.W.3d 170, 173 (Tex.App.—Tyler 2010, pet. denied) (citing *Scown v. Neie,* 225 S.W.3d 303, 309-10 (Tex.App.—El Paso 2006, pet. denied)). *See* §§ 281.003 and 281.004. Accordingly, if a public interest in the disputed road was acquired by implied dedication or prescription, it would have had to have been acquired prior to September 1, 1981.

### III.   CHAPTER 258 – TEXAS TRANSPORTATION CODE

In 2003, the Texas Legislature adopted Chapter 258 to establish an expedited procedure whereby a county could clarify the existence of a public interest in a road where it might not otherwise be able to prove the establishment of that interest by implied dedication or prescription due to the lack of witnesses with firsthand knowledge and thereby lose the right to maintain what the county considers to be a public road. *Bastrop County v. Samples,* 286 S.W.3d 102, 108 n.5 (Tex.App.—Austin 2009, no pet.) (quoting House Transp. Comm., Bill Analysis, Tex. H.B. 1117, 78th Leg., R.S. (2003)). Pursuant to Chapter 258, a county was permitted to adopt a "county road map that includes each road in which the county claims the existence of a public interest: (1) under Chapter 281 or other law; or (2) as a result of having continuously maintained the road with public funds before September 1, 1981." § 281.002(a). The adoption of a county road map under Chapter 258 is considered to be "conclusive evidence of: (1) the public's right of access over a road included on the map; and (2) the county's authority to spend public money to maintain a road included on the map." § 258.003.

Pursuant to section 258.002(b), a county has a valid claim concerning the existence of a public interest in a road "if it provides written records or other information documenting the county's continuous maintenance of the road beginning before September 1, 1981." "Continuous maintenance" means grading or other routine road maintenance before September 1, 1981, and continuing until the date of the protest. § 258.002(h). Accordingly, in addition to establishing that it had perfected an interest in the disputed road by implied dedication or prescription prior to September 1, 1981, in accordance with sections 281.003 or 281.004, Kent County was also required to provide written records or "documentation"[4] that it continuously maintained the road in question since that date.

Contrary to the concerns expressed by Wallace in issues one and two, Chapter 258 does not create a new basis for a county to establish a claim to a roadway. As it pertains to the facts of this case, it merely establishes a procedure whereby the county can clarify a public interest already in existence prior to September 1, 1981.

A person asserting a private right, title, or interest in a road in which the existence of a public interest has been asserted under Chapter 258 may contest the inclusion of the road in the county road map by filing suit in a district court in the county in which the road is located. § 258.004(a). In such a contested proceeding, the county has the burden of proving that it has continuously maintained, as that term is defined by section 258.002(h), the road in question. § 258.004(b). This proceeding is such a contest.

---

[4]To "document" means "to evidence by document; furnish documentary evidence." *Webster's Third New International Dictionary* (4th Ed. 1976).

## IV. EASEMENTS BY PRESCRIPTION / ADVERSE POSSESSION

Prescriptive easements are not well-regarded in the law. *Harrington v. Dawson-Conway Ranch, Ltd.,* 372 S.W.3d 711, 716 (Tex.App.—Eastland 2012, pet. denied). Such a claim must be established by "the open, notorious, hostile, adverse, uninterrupted, exclusive and continuous use of the servient estate for a period of more than ten years, and the absence of any of these elements is fatal to the prescriptive claim." *Allen v. Allen*, 280 S.W.3d 366, 377 (Tex.App.—Amarillo 2008, pet. denied); *see also Brooks v. Jones*, 578 S.W.2d 669, 673 (Tex. 1979) ("To obtain a prescriptive easement one must use someone else's land in a manner that is open, notorious, continuous, exclusive, and adverse for the requisite period of time.") In addition, "the owner of the subservient estate must have actual or constructive notice that there was an adverse and hostile claim against the property." *Allen,* 280 S.W.3d at 378. "Otherwise, the use (especially if joint) is presumed to be permissive, and a permissive use can never ripen into an easement by prescription." *Harrington,* 372 S.W.3d at 718. *See Vrazel v. Skrabanek,* 725 S.W.2d 709, 711 (Tex. 1987) (finding use of property with owner's express or implied permission or license will never ripen into a prescriptive easement no matter how long the use continues). The party claiming the existence of the prescriptive easement has the burden of proof to establish each element by a preponderance of evidence. *Boerschig v. Southwestern Holdings, Inc.,* 322 S.W.3d 752, 764 (Tex.App.—El Paso 2010, no pet.) (citing *Tiller v. Lake Alexander Properties, Ltd.*, 96 S.W.3d 617, 624 (Tex.App.—Texarkana 2002, no pet.)). *See Brooks,* 578 S.W.2d at 673. A public right-of-way by prescription can be established by showing an uninterrupted use by the public under an adverse claim of right. *County of Real v.*

8

*Sutton*, 6 S.W.3d 11, 17 (Tex.App.—San Antonio 1999, pet. denied) (citing *O'Connor v. Gragg*, 161 Tex. 273, 339 S.W.2d 878, 880-81 (1960)).

## V.    IMPLIED DEDICATION

Dedication is the act of appropriating private land to the public for any general or public use. *McCulloch*, 391 S.W.3d at 616; *Baker v. Peace*, 172 S.W.3d 82, 87 (Tex.App.--El Paso 2005, pet. denied). Whether a public right-of-way has been acquired by dedication is a question of fact. *Linder v. Hill*, 691 S.W.2d 590, 591-92 (Tex. 1985). Under common law, prior to September 1, 1981, a road could be created by either express or implied dedication. *McCulloch*, 391 S.W.3d at 616. Therefore, whether there has been an implied dedication of property is a question of fact. *Id.*

The elements of implied dedication are: (1) the acts of the landowner induced the belief that the landowner intended to dedicate the road to public use; (2) he was competent to do so; (3) the public relied on these acts and will be served by the dedication; and (4) there was an offer and acceptance of the dedication. *Linder*, 691 S.W.2d at 592. Generally, in order to establish donative intent, more than an omission or failure to act or acquiesce on the part of the owner must be shown. *Baker*, 172 S.W.3d at 88. Such evidence may include incidences of allowing public authorities to grade, repair, improve, or fence off the roadway from adjoining property. *Id.* However, evidence of a long and continued use of the disputed road by the public can raise a presumption of dedication by the owner when the origin of the public use is "shrouded in obscurity" and no evidence showing the landowner's intent in allowing the initial public use exists. *McCulloch*, 391 S.W.3d at 616.

9

Because an implied dedication results in the appropriation of private property for public use without compensation to the landowner, which appropriation would otherwise be prohibited under the Texas Constitution, a county bears a heavy burden when attempting to establish an implied dedication. See TEX. CONST. art. I, § 17. *See also County of Real v. Hafley,* 873 S.W.2d 725, 728 (Tex.App.—San Antonio 1994, pet. denied). Therefore, in this case, we must determine whether Kent County established that the origin of the disputed road was "shrouded in obscurity" and that from that time, the road has been subject to long and continuous use by the public. *McCulloch*, 391 S.W.3d at 616.

## VI. STANDARD OF REVIEW – DECLARATORY JUDGMENTS

Declaratory judgments are reviewed under the same standards as other judgments. TEX. CIV. PRAC. & REM. CODE ANN. § 37.010 (WEST 2008).

## VII. STANDARD OF REVIEW – SUFFICIENCY OF THE EVIDENCE

In conducting a legal sufficiency review, we must consider the evidence in the light most favorable to the challenged finding, indulge every reasonable inference in support of it; *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex. 2005), and credit favorable evidence if reasonable jurors could while disregarding contrary evidence unless reasonable jurors could not. *Id.* at 827. A challenge to the legal sufficiency will be sustained when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla.[5] *Kroger Tex. Ltd. P'ship v. Suberu,* 216 S.W.3d 788, 793

---

[5]Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of fact. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied,* 541 U.S. 1030, 124 S.Ct. 2097, 158 L.Ed.2d 711 (2004).

(Tex. 2006). In addition, so long as the evidence falls within the zone of reasonable disagreement, we may not invade the fact-finding role of the jurors, who alone determine the credibility of the witnesses, the weight to be given their testimony, and whether to accept or reject all or part of their testimony. *Wilson*, 168 S.W.3d at 822. The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review; *id.*, and, generally, if an appellate court sustains a "no evidence" or "legal sufficiency" issue, the appellate court must reverse and also render judgment. *See In re State ex rel. K.D.C.,* 78 S.W.3d 543, 551 (Tex.App.—Amarillo 2002, no pet.) (citing *Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 176 (Tex. 1986)).

DISCUSSION

By his third issue, Wallace contends the evidence was insufficient to support the jury's finding that Kent County was entitled to a prescriptive easement in the disputed road prior to September 1, 1981; and, by his fourth issue, he contends the evidence was insufficient to support the jury's finding that Kent County was entitled to an interest in that road by implied dedication.

## I. EASEMENTS BY PRESCRIPTION / ADVERSE POSSESSION

Here, Wallace testified he was never excluded from using the road and no witness testified they ever did anything to prevent Wallace from using the road. After the county removed the berms erected by Wallace to prevent others from using the road, the county implicitly acknowledged Wallace's right to control use of the road by paying him compensation for the berms it destroyed. That Lauderdale, his business

invitees and family also used the road was not adverse but contemporaneous with Wallace's use. Permissive use of the roadway running over another's property that is contemporaneous with the owner's use is not adverse use. *O'Connor*, 339 S.W.2d at 881. Accordingly, the county failed to offer any evidence on the element of adverse use or any notice, actual or constructive, of a hostile claim against the property. *See Allen,* 280 S.W.3d at 377-78.

## II. IMPLIED DEDICATION

Here, the testimony showed that Wallace's family sold their ranch in 1926 and leased it in 1962. At that time, Lauderdale's mother and sister used the road with Wallace's consent. Lauderdale came down on weekends from Lubbock. The Lauderdale family had travelled the road since he was six years old. In 1972, Wallace bought back the ranch and continued to allow Lauderdale's mother to use the disputed road to travel to and from her residence. In the 1980s, Lauderdale's mother moved to town and, in 1990, Wallace installed the gates and cattle guards. The gate between the Wallace and Lauderdale properties was locked almost every week and unlocked when Lauderdale visited on weekends. After Lauderdale's mother moved to town, David Parker delivered propane gas to the Lauderdale property by using the disputed road once or twice a year during the early 1980s through 1998. Prior to that, from the mid-60s into the early 1970s, Parker's father had delivered propane gas to Lauderdale's mother by using the road north of the Lauderdale residence that intersected Highway 70.

In 1993 and 1994, Conrad Buchanan, was involved in a statewide 911 project that included Kent County. According to his testimony, his first task was to determine which roads were public. In an effort to do that he drove every road in the county to assure that he did not miss a structure. After his 911 map showing all public roads was completed, the Kent County Commissioners Court voted to accept it.[6] His map did not show the road in controversy as a county road.

Don Trammel, County Commissioner for Precinct 4 from 1983 until 2003, testified the road in controversy was part of the county road inventory that was handed off from generation to generation by word of mouth. There were no written records. In 1984, Wallace told J.B. Gibson, a county road employee, not to grade on the road. Gibson later told Trammel that Wallace didn't want the county on the road and Wallace subsequently told Trammel the road was private. Trammel testified that, before speaking with Wallace, he had no idea how many times a year the road was bladed by the county, but, after speaking with Wallace, it was only graded two or three times.

Woody Byrd, County Road Superintendent between 1983 and 2009, testified he was not given a map of the county roads but "just grew up knowing where roads were basically." He testified no written records were kept on the maintenance of roads or the cost to maintain them. He indicated the road in controversy was part of the county road inventory "to some degree," i.e., it may have been bladed two or three times a year on

---

[6]At trial, Tommy Stanaland, County Judge 1995-2000, testified that the county commissioners never formally adopted the 911 map however, the map was completed several months before he assumed office in 1994. Jim White, County Judge from 2010-2011, testified the 911 map attempted to coordinate the county's 911 addressing system and identify all county roads. White also testified that, although the 911 map went through periodic revisions, the roadway in dispute was not added as a county road on the 911 map until after the county had completed its Chapter 258 proceedings. White also testified that, after a search of county records, he could not identify any county commissioners' record adopting the original 911 map.

an as-needed basis, but not any regular basis. Albert Brown, blade operator for Precinct 4 from 1999-2006, testified he bladed the road only five or six times in the six years he worked for the county. Brown indicated the road was not on the same maintenance schedule as other roads in the county. Instead, it was bladed on a "when told to do so" basis.

Robert Graham, County Commissioner for Precinct 4 after Trammel from 2003-2007, testified that, when he took over, Trammel told him where all the county roads were located. There were no maps or written records. Graham "assumed" the road in controversy was a county road because Trammel had it bladed. In 2004, he testified Lauderdale called and wanted the road bladed to remove some berms erected by Wallace to block the road.[7] Graham testified that, after he had the county road maintenance crews remove the berms, Wallace called indicating he was going to sue for damages. The Commissioners Court subsequently approved a payment to Wallace for his cost of erecting the berms. Graham testified the payment was intended to keep the county out of court.

Graham also testified the county subsequently removed berms a second time when a grass fire threatened to destroy Lauderdale's residence. Charles Arnold, blade operator for Precinct 4 from 2006 to present, testified he removed the ends of the berms to allow firefighters through to fight the grass fire. No payment was made to Wallace in connection with the second berm-removal. Arnold also testified there was no scheduled

---

[7]The berms were walls of earth approximately six or seven feet tall. Testimony was given that berms prevented access to the road and had to be removed in order to blade the road. Testimony also indicated Wallace did not ask permission to build the berms.

14

maintenance on the road and that maintenance was performed on an as-needed basis once the berms had been removed.

Lauderdale testified he has requested road maintenance from County Road 440 up to his residence and the county bladed the road. He testified that, between 2000 and 2005, he cut locks on Wallace's gates and once removed a cattle guard blocking the road. Going in and out of his property on weekends, he also observed the road had been bladed but didn't know who did the work. At one point, a person leasing Lauderdale's grass was stopped by Wallace at a gate while the lessee was hauling cattle. Wallace refused passage until the Sheriff convinced him to let the lessee pass in order to avoid possible legal action if any calves were somehow injured.

Lauderdale also testified Wallace erected berms six or seven times and interrupted county maintenance for two or more years. Although the county removed the berms twice, Lauderdale removed the berms the remaining times and bladed the road himself over a three year period. Byrd testified the county ceased maintaining the road for a while due to the Wallace/Lauderdale controversy and stopped maintenance altogether about a year before the Chapter 258 proceedings were commenced in April 2007.

The evidence of use prior to September 1, 1981, included testimony that Tommy Stanaland travelled the road once as a child with this father to retrieve a lost bull and that he had observed a county road maintainer on the road, that Lauderdale and his family travelled the road (albeit with Wallace's consent for a time), that county road

equipment was parked at the Lauderdale residence one weekend, and that Bob Byrd travelled the road for a week in the 1940s when he was working as a cowpuncher.

Countering the implication of public use by virtue of the limited maintenance of the road, there was also testimony that the county maintained other private roads on occasion. Wallace also testified he and his father allowed Lauderdale's mother to use the road and cross their land until she moved to town. Lauderdale corroborated Wallace's account of his family's use.

Based on this record, we find there is no evidence that either Wallace or his predecessors in title ever induced the belief that a dedication of the road to public use was ever intended or that the public relied on those acts and would be served by any such dedication. The road simply leads from County Road 440 across Wallace's land for 4 miles and then dead-ends at the Lauderdale residence. Accordingly, we find that no reasonable and fair-minded juror, properly instructed on the law applicable to implied dedication, could possibly find that Wallace impliedly dedicated the road for public use. *Cf., for example, McCulloch*, 391 S.W.3d at 617 (evidence that county regularly maintained the roadway and that it was used by commercial enterprises, families going back and forth, children going to and from school, emergency management coordination, and forest service crews); *Las Vegas Pecan & Cattle Co.,* 682 S.W.2d at 256-57 (uncontroverted evidence that general public used road over thirty years as a mail route, school route, and county maintained road with county employees and equipment); *Linder,* 673 S.W.2d at 616 (road was only route to public school); *Graff v. Whittle,* 947 S.W.2d 629, 636 (Tex.App.—Texarkana 1997, pet. denied) (road used to reach a store, catch a bus, transport goods to town, go to church and school and was

16

the only path of ingress and egress from one community to another).  Instead, all we have is testimony of incidental use by a rancher who travelled the road once to retrieve a stray bull, a cowpuncher who used the road for a week when he was employed by a landowner bordering the road, and the Lauderdale family who used the road with Wallace's permission.

### III.    CONTINUOUS MAINTENANCE

Even if Kent County were able to establish a prescriptive easement or implied dedication of the disputed road prior to September 1, 1981, we also find there is no evidence Kent County asserted any valid claim of the existence of a public interest in the disputed road because the county failed to come forward at trial with *any* "written records or other information documenting" the road's continuous maintenance since before September 1, 1981.  Byrd, County Road Superintendent from 1983 through 2009, testified Kent County kept no records on road maintenance or the cost of maintaining any particular road.  The *only* evidence that road maintenance was performed prior to 1983 was anecdotal information or "highway lore" passed down from commissioner to commissioner by word of mouth from generation to generation.  Although Chapter 258 was enacted to assist counties to prove up a public interest in roads, we cannot ignore Chapter 258's plain language.  Thus, we find the record contains no documentation of continuous maintenance or the expenditure of public funds to maintain the disputed road beginning before September 1, 1981.

## CONCLUSION

Wallace's third and fourth issues are sustained and his first and second issues are pretermitted. *See* TEX. R. APP. P. 47.1. We reverse the judgment of the trial court and render judgment, in part, declaring the road in question to be a private road owned by Wallace and that Kent County take nothing by its declaratory judgment action. Because the trial court has not addressed Wallace's prayer for the recovery of attorney's fees pursuant to this disposition, we remand the case to the trial court for further proceedings consistent with this opinion.

Patrick A. Pirtle
Justice

.